**Womble Bond Dickinson (US) LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ 85004

**Todd Feltus** (State Bar No. 019076)
Direct Dial: 602.262.5397
Direct Fax: 602.262.5747
Email: Todd.Feltus@wbd-us.com

**Yalda Godusi Arellano** (State Bar No. 034742)
Direct Dial: 602.262.5311
Email: Yalda.Arellano@wbd-us.com

**Katerina Grainger** (State Bar No. 038677)
Direct Dial: 602.262.5387
Email: Katerina.Grainger@wbd-us.com

*Attorneys for Plaintiffs CAE Aviation*
*Academy Phoenix, LLC and Thrust Flight, LLC*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| CAE Aviation Academy Phoenix LLC, et al, | Case No.   2:26-cv-03325-KML |
| Plaintiffs, | **VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| City of Mesa, | |
| Defendant. | |

Plaintiffs CAE Aviation Academy Phoenix LLC ("CAE") and Thrust Flight, LLC ("Thrust") (collectively, "Plaintiffs") for their First Amended Complaint allege as follows:

**INTRODUCTION**

1.    On March 23, 2026, the City of Mesa enacted Resolution No. 12480 (the "Resolution") that imposes new landing fees "for services provided by Falcon Field Airport" of $20.35 per landing on aircraft based at Falcon Field. The Resolution allows ten free landings a month before the new fee is imposed. The Resolution's purpose is to resolve noise complaints made by residents surrounding Falcon Field related to the flight school activities. The Resolution was intended to – and in fact does – almost exclusively impact flight schools, including CAE and Thrust who account for over one-half of the landings at Falcon Field ("FFZ").

2. The Resolution was implemented in a hasty manner after the City of Mesa (the "City") determined in December 2025 that it could not regulate noise under federal law. It then contrived a fiscal shortfall to warrant the landing fees. This contrived shortfall relies on unwarranted assumptions, contradicts plans implemented by the City, and omits the millions in grants the City receives from state and federal government.

3. As detailed below, the Resolution is preempted by federal aviation law, violates the Dormant Commerce Clause of the United States Constitution, violates the Anti-Head Tax Act, and violates the Arizona Constitution. The City also adopted the Resolution in violation of Arizona's Open Meeting Law and Mesa City Code. CAE and Thrust seek declaratory and injunctive relief to prohibit Defendant from implementing and enforcing the unlawful Resolution.

**PARTIES, JURISDICTION & VENUE**

4. Plaintiff CAE Aviation Academy Phoenix LLC is an Arizona limited liability company that provides flight training and runs cadet programs for airlines worldwide.

5. CAE is a citizen of Delaware and New Jersey.

6. Plaintiff Thrust Flight, LLC is an Arizona limited liability company and an educational institution that offers a variety of aviation training courses at FFZ.

7. Thrust is a citizen of California, Delaware, Florida, foreign states, Georgia, Illinois, Kentucky, Michigan, Missouri, New Jersey, New York, North Carolina, North Dakota, Ohio, South Carolina, Texas, and Virgina.

8. Defendant City of Mesa is an Arizona municipal corporation located in Maricopa County, Arizona.

9. The City owns and operates FFZ as a municipally owned general aviation airport.

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution (Art. I, § 8, cl. 3; Art. VI, cl. 2) and federal statutes (49 U.S.C. § 40116). This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because they arise from the same

- 2 -

nucleus of operative facts.

11. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties, and as further alleged below, the matter in controversy exceeds the sum or value of $75,000. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."); *see also Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[A]n LLC is a citizen of every state of which its owners/members are citizens.").

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District, all relevant events giving rise to Plaintiffs' claims occurred in this District, and FFZ is located in Mesa, Maricopa County, Arizona.

13. CAE and Thrust have Article III standing because they face an injury in fact that is concrete, particularized, and either actual or imminent. The Resolution imposes per-landing fees directly on CAE and Thrust's flight-training operations at FFZ. As flight-training schools that necessarily conduct high-frequency takeoffs and landings as part of federally mandated training curricula, CAE and Thrust will incur substantial and unavoidable costs once the Resolution is implemented. CAE and Thrust have determined that continued operations at FFZ will be unsustainable and burdensome under the fee structure.

14. These injuries are "sure to" occur because CAE and Thrust are directly subject to the new landing fees and have no means of avoiding them while continuing their flight-training programs. *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 987 (9th Cir. 1991).

15. CAE and Thrust's injuries are traceable to Defendant's conduct because the City adopted and will enforce the Resolution. The injuries are redressable by a favorable decision because declaratory and injunctive relief preventing enforcement of the Resolution would eliminate the threatened fees and allow Plaintiffs to continue operations at FFZ.

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

16.    CAE and Thrust's claims are ripe for adjudication. The Resolution is a final legislative act adopted by the City Council on March 23, 2026, with an effective date of May 1, 2026. No further governmental action is required before the new fees are imposed on Plaintiffs, on or before July 30, 2026. The issues presented are fit for judicial decision because they involve purely legal questions of federal preemption, statutory compliance, and constitutional validity. Withholding review would cause CAE and Thrust hardship because they face imminent, irreparable harm absent judicial intervention.

17.    Because CAE and Thrust seek only declaratory and injunctive relief at this time, no notice of claim is required under A.R.S. § 12-821.01. *See Martineau v. Maricopa Cnty.,* 207 Ariz. 332, 336–37, ¶¶ 22–24 (App. 2004); *State v. Mabery Ranch Co.*, 216 Ariz. 233, 245, ¶¶ 52-53, 165 P.3d 211, 223 (App. 2007).

## GENERAL ALLEGATIONS

**A.    Falcon Field's History of Flight Instruction.**

18.    FFZ has a storied history on flight instruction. Opened in 1941, FFZ served as a training facility for British Royal Air Force and American pilots during World War II. During the course of the war, more than 2,300 Royal Air Force cadets completed primary and advanced flight training at FFZ.

19.    After World War II, the United States transferred ownership of FFZ to the City, which has owned and operated the airport since then.

20.    Under the City's ownership, FFZ has been a general aviation airport that has continued flight training and instructional activities. Approximately 877 aircraft are based at FFZ, making FFZ one of the most active general aviation airports in the United States.

21.    Historically, FFZ has been one of the busiest training airports in the country. The weather and complex air traffic environment makes the Phoenix area an ideal place for flight training. As a result, flight schools have long flourished at FFZ and relied on the City to support its long-standing training mission of supporting flight education.

22.    The Phoenix metropolitan area is uniquely suited for flight training because its climate provides nearly year-round Visual Flight Rules ("VFR") conditions—with over

201 East Washington Street, Suite 1200
Phoenix, AZ  85004

WOMBLE BOND DICKINSON

300 days of clear skies annually, minimal precipitation, and mild temperatures that permit consistent, uninterrupted outdoor flight instruction—making it an ideal place for flight training.

23. In addition to these weather advantages, FFZ hosts a significant existing concentration of flight-training infrastructure and operations—including multiple established flight schools, almost 900 based aircraft, FAA-controlled Class D airspace with dedicated air traffic control services, and decades of institutional investment in hangars, classroom facilities, simulation equipment, and training curricula—that cannot be replicated at alternative locations without years of capital investment and regulatory approvals.

24. FFZ has been designated as a reliever airport in the National Plan of Integrated Airport Systems. The goal of reliever airports is to attract general aviation traffic away from congested commercial airports, such Phoenix Sky Harbor and Phoenix Mesa Gateway Airport.

25. The volume of flight activity in the Phoenix area is extremely high. The Federal Aviation Administration ("FAA") has acknowledged that its distribution in the National Airspace System is a delicate balance, and the agency has recently undertaken efforts to implement performance-based navigation and amend the airspace in the Phoenix area. Presently, flight training activities are distributed among numerous airfields within the immediate Phoenix area, with Sky Harbor Airport situated centrally within that system.

26. Aircraft classified under 14 C.F.R. Part 36.1(f) as Stage 3, Stage 4, and Stage 5 regularly land at FFZ.

27. The Resolution imposes landing fees on all fixed-wing aircraft at FFZ, including Stage 3 aircraft, and the Resolution's noise-driven purpose and operational effects are not limited to any particular aircraft noise stage classification.

28. Because the Resolution constitutes a noise or access restriction that "affect[s] the operations of Stage 2 or Stage 3 aircraft," 14 C.F.R. § 161.5, it falls within the scope of ANCA.

- 5 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

29.   The City has described how this delicate balance works around FFZ:

> Class D airspace at Falcon Field starts from the surface to 3,399 ' mean sea level and is a cylindrical cone shape flattened at the western boundary by Phoenix Sky Harbor Airport Class B Airspace. This boundary is delineated at Gilbert Road in Mesa. The diameter of the airspace is 5 statute miles. It underlies Phoenix Sky Harbor Airport Class B Airspace which begins at various altitudes over Falcon Field Class D airspace. In addition, a narrow corridor of airspace exists above the Falcon Class Delta airspace, and below the Class Bravo airspace for Sky Harbor, providing a means for Visual Flight Rule (VFR) aircraft to transition through the area. While operating in Class D airspace a pilot is required to establish communications with Falcon Field Air Traffic Controllers.

30.   In addition to its other activities, The Boeing Company and MD Helicopters operate significant facilities at FFZ where they manufacture helicopters that use the airport.

**B.   The City Can Only Impose User Fees that Fairly Allocate Costs Among Users and Does Not Impose an Unjust Burden on a Specific Class of Operators.**

31.   Although FFZ is a City-owned airport, it receives funds from the Airport Improvement Fund and is bound by FAA grant assurances to remain a recipient of those funds.

32.   The City is required to make FFZ available to all users on reasonable conditions and without unjust discrimination.

33.   The City is limited to use revenues generated by FFZ for capital or operating costs. While the City may recover costs of providing facilities through user fees, those fees must allocate costs fairly among users and cannot impose an unjust burden on a specific class of operators.

**C.   CAE's Long and Productive History at Falcon Field.**

34.   CAE has operated at FFZ continuously since 1991, through its predecessor, Sabena Flight Academy, acquired by CAE in 2008. Through its parent and affiliated companies, CAE is part of the largest flight training network in the world.

35.   CAE serves both international students and students from across the United States. Its training programs supply pilots to interstate and international air carriers

operating under uniform federal certification standards and within an integrated national aviation system.

36.    At FFZ, CAE trains pilots for numerous airlines and operators, including American Airlines, JetBlue, Southwest Airlines, Japan Airlines, and the United States Air Force.

37.    CAE maintains an impeccable reputation among national and international airlines, and these airlines rely on CAE to train and prepare quality and well-trained student pilots.

38.    CAE employs around 230 people and 150 flight instructors at FFZ, many of whom rely on their work at CAE to earn a living.

39.    During its time at FFZ, CAE has made substantial capital investments in FFZ's facilities and operations. In 2024, CAE entered into its current leases at 5010 and 5030 E. Falcon. The leases run through 2033, reflecting CAE's long-term commitment to FFZ, and its plan to continue training the next generation of pilots to keep our skies safe.

40.    CAE leases approximately 51,010 square feet of office and flight-training classroom space at 5010 E. Falcon Drive, Mesa, Arizona, under a ten-year lease, at a current monthly base rent of approximately $100,341.

41.    CAE also leases approximately 31,930 square feet of office and hangar space at 5030 E. Falcon Drive under a separate ten-year lease for the same term, at a current monthly base rent of approximately $43,364.

42.    CAE bases 68 aircraft at FFZ. These aircraft include 50 Piper Archers, 8 Piper Seminoles, 2 DA20s, and 8 SR20s.

**D.    Thrust Recently Started Flight Training at Falcon Field.**

43.    In contrast to CAE, Thrust is a newcomer to FFZ and has expended much time, effort, and capital into renovating its space at FFZ.

44.    Founded in 2006, Thrust had operated solely in Texas. As a business, Thrust has exclusively focused on flight training since 2017.

45.    In 2025, the City encouraged Thrust to expand its operations from Texas to

- 7 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

FFZ. Thrust moved quickly into the market and began training students at FFZ in the summer of 2025.

46.   Now at FFZ, Thrust trains student pilots from all over the United States; Thrust trains its students to be safe, confident, and disciplined aviators through classroom instruction, approved flight simulation devices, and in-flight training in modern aircraft.

47.   Thrust bases 5 aircraft at FFZ and plans to base 5 more aircraft at FFZ by the end of 2026. These aircraft include Piper Archers and Piper Seminoles.

**E.   Development Reaches Falcon Field and the City Encourages Further Development Through Land Sales.**

48.   FFZ is located approximately six miles to the northwest of the center of Mesa. Development has worked its way out to and beyond the airport.

49.   While the City has been encouraging the growth and expansion of flight schools at FFZ, it was also encouraging and facilitating the development of the land surrounding FFZ.

50.   In 2006, the City sold Airport-owned land located at Thomas Road and Recker Road, which generated over $4.6 million in revenue applied to the Airport's Enterprise Fund.

51.   The City approved the sale of that Airport-owned land—located immediately adjacent to FFZ—for residential development. Residential properties were subsequently developed in areas beneath or near established approach and departure paths.

52.   Again in 2019, the City approved the sale of approximately 132 acres of City-owned land adjacent to FFZ for residential development.

53.   Following these land sales, residential developments were constructed adjacent to and in the vicinity of FFZ, including in areas where aircraft operations and overflight activity had long occurred.

**F.   The City's Plans for Falcon Field over the Past Five Years.**

54.   In 2021, the City adopted an Airport Master Plan for FFZ. The City stated that the "ultimate goal of the Master Plan is to provide guidelines for the Airport's overall

maintenance, development, and operation in an environmentally and fiscally responsible manner while adhering to appropriate FAA and Arizona Department of Transportation (ADOT) – Aeronautics Group standards."

55. Between 2008 and 2021, the City received over $16.6 million from the FAA and ADOT for capital improvement projects.

56. The City reported that the pavement conditions of its runways were generally in good condition. The Airport Master Plan reported a projected general airfield pavement maintenance cost of $2 million of which over $1.9 million would be funded by the FAA and ADOT. The City's project share was $89,400.

57. In the 2024/2025 fiscal year, the City reported that it had a surplus of nearly $500,000 for FFZ and an existing fund balance of over $6.1 million.

58. The actual numbers for the 2024/2025 fiscal year only reported approximately $800,000 in "Project Cost."

59. The City's 2026-2030 overall Capital Improvement Program listed twelve FFZ-related projects totaling $26.5 million. Over $19 million of these project costs were projected to be funded by grants. Over $4.2 million of City-funded projects related to improvements on city-owned buildings and property. Just under $3 million related to the airport infrastructure itself.

60. The City's estimated expenses for fiscal year 2024/2025 do not align with the City's actual Project Cost numbers.

**G.    New Residential Development Plus Increased Flight Training Demand Equals Noise Complaints.**

61. Coinciding with the rapid development around FFZ has been the growth of the flight training schools – both at FFZ and around the country. There has been increased demand for new pilots and expansion in the airline industry. With significant growth in the past decade, the flight market is expected to continue its significant growth over the next several years.

62. The combination of new residents around FFZ and growth in flight activity

culminated in a predictable series of noise complaints. Residents in those adjacent developments began submitting complaints and petitions to City officials concerning aircraft noise and traffic associated with airport operations, including requests that the City take action to address those concerns.

63.    Post-sale residential developments, including neighborhoods situated directly under historic flight paths, have complained about the noise and congestion even though FFZ history of flight training long predated the residential developments.

64.    While residents have increasingly voiced concerns about aircraft noise, those concerns arose in those areas where development proceeded with City awareness of existing airport operations and over 80 years of well-established flight activity—conditions the City itself had long identified.

65.    Residents organized petitions and appealed to the City to intervene.

66.    The City conducted meetings with community members to respond to the noise complaints. In these meetings, the City informed residents that the City is not permitted by the FAA to create mandatory noise control measures or prohibit user access to FZZ, because that area is controlled by federal law. *See* Falcon Field Understanding Airport Operations, Las Sendas Community Association, May 6, 2025, https://youtu.be/I67iWNXnWKI?si=NCfohDk24JhDo9Hl.

67.    When residents asked if the Airport could decrease the number of planes flying over populated areas, the City responded, "unfortunately, we cannot restrict, at our airport, our users and the number of aircraft operations that we accept. It's not something that we have the power to control." *Id.*

68.    When asked why there is an increase of air activity over Las Sendas, an affluent community in East Mesa, the City explained, "we are experiencing more demand in flight training as the baby boomers, as a generation of pilots, are retiring en masse, and there is a significant demand in the worldwide aviation market for commercial airline pilots. So, there is more aircraft training taking place." *Id.*

69.    When asked if the City is able to increase the price that pilots pay to use the

- 10 -

airport or decrease the number of planes, the City responded, "We can't decrease the number of aircraft. . . we are like a highway, we have to be available for the public. We do review and benchmark our rates and fees. There is *(sic)* some federal government regulations for receiving federal grants, that we need to be fair with our pricing structure, and reasonable, so we can't just price out [airport users] because we want to. We have to justify [our pricing] with recouping our costs, with a little bit of holdover for unexpected events. But we also have to ensure our pricing is not way out of line from our peer airports in the industry." *Id.* (cleaned up).

**H.    The City Conjures a Revenue Shortfall to Address the Noise Complaints.**

70.    Facing increasing pressure from constituents to limit air traffic due to noise concerns, the City sought to devise a solution that accounts for its limited ability to regulate noise. To do so, it manufactured a fiscal crisis for FFZ so that it could impose onerous fees on flight schools, including CAE and Thrust.

71.    Starting in December 2025, the City claimed that it needed to address an operating deficit in the FFZ's finances after it had consistently reported that FFZ operated at or above a break-even level, including the surplus revenue it generated in the fiscal year ending June 30, 2025.

72.    The City reported that it paid for FFZ's operating expenses from capital funds from property sales. But the City has not provided evidence on the FFZ financial statements that it had been diverting these capital funds to airport operations.

73.    The City also claimed that it has deferred necessary pavement maintenance, notwithstanding the fact that the FAA and ADOT would have funded 95% of the expenses. The City has claimed that the runway payment conditions are below applicable standards because of the deferred maintenance.

74.    The airport and all facilities that are necessary to serve aeronautical users of an airport must be operated at all times in a safe and serviceable condition and in accordance with minimum required standards. FFZ is required to have arrangements for notifying pilots of unsafe conditions.

- 11 -

75.     The City has not disclosed to CAE or Thrust that unsafe conditions exist at FFZ. In addition, in connection with the CAE's 2024 renewal of its lease and Thrust's 2025 commence of operations at FFZ, the City failed to disclose that deferred routine and necessary maintenance, and the runway pavement conditions were below applicable standards.

**I.     The City's Irreconcilable Financial Forecasts.**

76.     The City also manipulated FFZ's project cost numbers so that it allocated all costs to the City without accounting for the grants that the City projected in its 2026-2030 Capital Improvement Program ("CIP"). The City's manipulated numbers project a multimillion deficit in fiscal year 2025/2026 and deficits exceeding $1 million every year thereafter.

77.     Even then the Project Costs from the City's 2026-2030 5-year Financial Forecast (the "Forecast") cannot be reconciled with the CIP.

78.     If the City had included grant revenue in the CIP and excluded costs related to City buildings that have no connection to FFZ's operations, it would have an approximate $500,000 deficit in fiscal year 2025/2026, but significant surpluses in the following four years.

79.     Even accounting for the City's expenses related to its buildings and property, the Forecast projects a $5 million surplus after accounting for the $19 million in grants that would largely fund FFZ's capital projects.

80.     According to the City, in 2024, it created an "Airfield Cost Center" that includes "pavement maintenance (runways/taxiways, non-exclusive ramps), airfield lighting, aircraft landing aids (PAPIs/REILS), safety areas, utilities, perimeter fence/gates, aircraft rescue firefighting services, terminal building/airport maintenance facility, airport personnel, airfield equipment, airport's portion of FAA & State grant projects." The Airfield Cost Center is not identified in the Forecast.

81.     The City estimated that the Airfield Cost Center will have a shortfall of $2,036,132 for the fiscal year 2025-26. The City estimated that it will only receive $374,300

- 12 -

in revenue without initiating landing fees, but attributed costs of the Airfield Cost Center at $2,410,432. The City does not identify the source of the revenue or address grants that would fund airfield costs.

82. The City estimated that the cost to maintain the runway pavement would be $5.75 million each year. This amount would constitute the vast majority of the City's forecasted expenses. The City did not disclose that the FAA and ADOT historically provided 95% of the funding for runway maintenance. And, in fact, it failed to disclose that any grants would be available.

**J.      To Minimize Flights and Noise Complaints, the City Decides to Impose Landing Fees Based on Its Conjured Cost Justifications.**

83. To plug the contrived deficit in the Forecast, the City derived a landing fee scheme that was directed to tax the flight schools, including CAE and Thrust. Under this scheme, the City would charge $20.35 per landing for any based aircraft that has more than 10 landings per month. This fee would make it cost prohibitive for the flight schools to operate and was intended to minimize flight school landings.

84. Flight training schools have a disproportionate amount of takeoffs and landings because touch-and-gos are a necessary and regular part of the flight-training process. These are not incidental—they are the core of FAA required curriculum, recurrent proficiency training, and safety critical pattern work.

85. The City contemplated that the landing fees would allow for the first 10 landings each month for based aircraft to be free. The "first 10 landings free" feature is functionally irrelevant to flight schools conducting recurrent pattern work and student training, because those operations necessarily exceed ten landings per aircraft quickly, likely within the first hour of the first day of the month, while similarly situated based operators will not.

**K.      The City's Analysis Relies on Faulty and Unwarranted Assumptions to Justify Landing Fees.**

86. In fact, the City analysis of the revenue generated from landing fees revealed

- 13 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

that for aircraft based on FFZ, only nine airplane models would pay any landing fees. Two models that are training aircraft – the Piper PA-28-140 Archer and the Cessna 172 Skyhawk – account for the vast majority of the based-aircraft landing fees.

87.    The City's data show that the based-aircraft landing fees would be borne almost exclusively by training aircraft. The ten-landing threshold for based users will be exceeded only by high-frequency training operations, thereby concentrating the burden on flight schools operating at FFZ.

88.    In computing the fees, the City made unwarranted assumptions regarding how many of the landings were made by Piper based aircraft. The City assumed that 48,000 landings would be made by Piper aircraft. In total, the City projects that landing fees would only apply to approximately 71,000 landings.

89.    CAE currently trains an average of 115 student-pilots per day and 640 student-pilots per year. Each CAE student-pilot conducts an average of 3.5 landings per day.

90.    Based on current activity, CAE projects that it will have more than 150,000 annual landings at FFZ.

91.    Thrust currently trains an average of 12 student-pilots per day and 30 student-pilots per year. It anticipates training up to 78 student-pilots by the year's end.

92.    Based on current activity, Thrust projects that it will have approximately 28,000 annual landings at FFZ. Since Thrust is a growing program, this figure is an under-approximation.

93.    The City did not contact CAE or Thrust to test its assumptions. If they had, they would have learned that CAE and Thrust collectively account for over half the landings at the airport and that its actual activity is well over double the City's projections for all landings subject to the landing fee.

94.    By CAE's calculations, under current usage, the per-landing fee structure will cost CAE approximately $3.2 million per year.

95.    Upon information and belief, the per-landing fee structure will cost Thrust

- 14 -

more than $500,000 per year, not accounting for the anticipated increase in student-pilots.

96. The City projects that aircraft based at FFZ will generate $1,450,000 in landing fees. This is over $2 million less than CAE's and Thrust's estimate based on their actual activity. Based on this reality-based estimate, the landing fees have no relation to the airport's costs.

97. A fee that treats each touch-and-go as a separate event transforms routine training into a repeated, compounding charge that is not calibrated to any individualized impact in a way that differs meaningfully from other users making comparable movements.

98. The City also falsely portrayed that its landing fee scheme is consistent with what other general-aviation airports around the country charge for landing fees. For example, it relies on landing fees charged at five Connecticut airports. But none of these five airports charge any landing fees to based aircraft or training flights. The landing fees being charged for based aircraft are disproportionate and unprecedented compared to what other general aviation airports are charging.

99. The City's focus on flight schools is further evidenced by the session-based exemption for rotorcraft training. This demonstrates that the City recognizes that counting each landing in high frequency training contexts does not fairly track "use" in the sense relevant to compensatory facility charges.

100. The City's landing-fee scheme expressly allows fee increases if operations decline beyond projected levels, decoupling the charge from actual use: when users *reduce* operations, the policy authorizes *increasing* the per-use price to maintain the same projected revenue for fewer landings – and presumably wear and tear on the runway.

101. The built-in procedure to raise fees if operations decline also confirms the charge is designed to ensure a certain amount of revenue, not recover costs.

**L.    The Rushed Process to a City Council Vote.**

102. The City attempted to rush the landing fee scheme to a council vote in February 2026. It ultimately delayed the council vote until March 23, 2026.

103. The fees were adopted with minimal stakeholder consultation and inadequate

- 15 -

notice. The City has not produced or made public data that supports the issuance of fees. Based on available information, the City does not appear to have based its fee structure on a defensible rate base.

104.    The City has not meaningfully received or addressed input from the general aviation community; in particular, City leadership only offered an opportunity for a cursory meeting just days prior to the scheduled vote. The brief meeting was merely perfunctory: the enactment of the ordinance adopting the landing fees proceeded by way of a hasty, opaque process.

105.    As a result of the City and Airport being generally unavailable for input, the City and Airport not only failed to address concerns with their faulty assumptions and grant assurance compliance but also issued a decision that showed their disregard for safety implications on the Falcon Field airspace.

**M.    The City Adopts the New Landing Fees.**

106.    On March 23, 2026, the City Council unanimously passed Resolution No. 12480 (the "Resolution").

107.    The Resolution was placed on the consent agenda as Item 5-c, described on the public agenda only as: "Modifying fees and charges for Falcon Field Airport. (Citywide)."

108.    The agenda did not expressly reference "landing fees" or indicate that the City was adopting an entirely new category of per-landing charges.

109.    The Resolution states that it is:

> A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MESA, ARIZONA ADOPTING NEW AND MODIFYING FEES AND CHARGES FOR THE FALCON FIELD AIRPORT.

110.    Resolution No. 12480 further states in Section 1:

> The fees and charges for services provided by Falcon Field Airport, true and correct copies of which are attached hereto as Exhibits A and B and made a part hereof and incorporated herein by reference, are approved and hereby adopted to be

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

- 16 -

WOMBLE BOND DICKINSON

201 East Washington Street, Suite 1200
Phoenix, AZ 85004



effective on May 1, 2026. Deletions are shown as strikeouts: A&G. Additions to the text are shown in bold and capital letters: **ABC**. New or increased fee amounts are shown in bold: **$10.00**.

111. Resolution No. 12480 further states in Section 2:

All fees and charges for services provided by the Falcon Field Airport previously approved and adopted and not amended or increased by this Resolution remain in effect.

112. Section 3 of Resolution No. 12480 states:

To implement the new landing fees, Falcon Field Airport will go through the procurement process to contract with a third-party to track airport takeoffs and landings at the airport. If the third-party vendor is not in place and prepared to track aircraft takeoffs and landings on May 1, 2026 (the date the landing fees go into effect), the Airport Director, in the Airport Director's discretion, may delay the implementation date of the landing fees in Exhibit A to a date when the third-party flight tracking system is in place, not to exceed 90 days. If the Airport Director delays the implementation of the landing fees pursuant to this Section 3, the Airport Director shall provide notice (e.g., notice of the Falcon Field Airport website) of the delay and the date the landing fees will be implemented.

Ex. 1.

113. Exhibit A to the Resolution establishes the following per-landing fees, effective May 1, 2026:

(a) Based fixed-wing aircraft ≤ 6,000 lbs. MLW: $20.35 per landing;

(b) Based fixed-wing aircraft > 6,000 lbs. MLW: $3.40 per 1,000 lbs.;

(c) Itinerant fixed-wing aircraft ≤ 6,000 lbs. MLW: $24.35 per landing;

(d) Itinerant fixed-wing aircraft > 6,000 lbs. MLW: $4.10 per 1,000 lbs.;

(e) Based rotorcraft, drones, and eVTOL: $12.60 per landing;

(f) Itinerant rotorcraft, drones, and eVTOL: $17.60 per landing.

114. The Resolution exempts the first ten landings per month for aircraft based at FFZ.

115. It also exempts "[a]ll but one of the landings performed in a continuous

- 17 -

session for training and testing purposes" by rotorcraft during hovering, pattern work, back-and-forth movements, or combinations thereof.

116. By contrast, fixed-wing aircraft performing touch-and-go training operations incur a fee for each individual landing, with no comparable session-based exemption.

117. The Resolution contains a revenue-stabilization mechanism: if average aircraft operations at FFZ decrease by twenty percent or more from year-over-year numbers for three consecutive months, the City Manager may increase landing fees by the amount of the decrease exceeding the anticipated ten percent reduction. This feature expressly authorizes fee increases when operations decline.

118. The Resolution contains no findings, studies, or cost-allocation analyses establishing that the per-landing charges reflect the actual marginal costs imposed by each landing on airfield infrastructure.

119. The City of Mesa did not provide a reasonable or use-based explanation for the calculation of fees.

120. Instead, Defendant conclusively asserted that it determined the amount of revenue needed to make the "Airfield Cost Center" self-sustaining.

121. Defendant's estimated annual fiscal impact of the total of the fee adjustments is $2,894,770, which also includes increases to hangar and storage room rents, as well as tiedown fees and fuel flowage fees. This includes an anticipated 10% reduction of landings based on the imposition of landing fees.

122. Even with the undisclosed costs associated with the third-party vendor required for implementation, the alleged fiscal impact of the program is entirely inconsistent with the underlying data.

123. Only accounting for landing fees assessed against CAE and Thrust, excluding other fee increases and all other airport users, Defendant should expect up to **$4 million from two users alone**.

124. The City's fiscal impact is a vast underestimation *unless* it anticipates losing the majority of flight schools due to the Resolution.

- 18 -

125.    Although Defendant acknowledged that it receives FAA and State of Arizona grants to help with some capital improvements, it did *not* include the amount it receives each year from grants to cover operating costs in their estimated shortfall figure.

126.    When defending the Resolution to the public, Defendant did not acknowledge the sizeable contributions of Airport Pavement Management System through ADOT for pavement construction (up to 90% of eligible pavement costs).

127.    The Airport's financial forecast table relied on by the City did not include explanatory materials, the basis for the figures, or any itemized costs. The table referred to broad categories, such as "Other Department Direct Costs" and "Transfers Out."

128.    The meaning and reasoning behind these amounts are unknown to the public, as they did not provide an adequate explanation for how these numbers were reached.

129.    The City's 2026-2027 Airfield-Fixed Wing Cost Center Capital & Maintenance Program Costs for Landing Fee Calculation shows that it will receive millions in dollars of grant funds that will apply to its projects for the next five years, approximately $5.3 million in grants will be used for the $6.4 million in project cost.

**N.    The Aftermath of the Landing Fee Resolution.**

130.    Upon information and belief, Mesa residents have submitted public records requests to identify the basis for the alleged operating costs and expenses; the City has not complied with its obligations to provide these materials to the public.

131.    On April 17, 2026, Plaintiffs submitted a public records request on the City, but have yet to receive any records.

132.    On or about May 12, 2026, Plaintiffs and other flight-training operators at FFZ submitted an informal complaint to the FAA under 14 C.F.R. § 13.2, requesting an investigation into whether the City's landing fee program violates FAA Grant Assurances 22, 24, and 25 under 49 U.S.C. § 47107. The FAA's investigation will be conducted on a grant-assurance-compliance basis rather than on the basis of the constitutional violations or federal preemption claims raised in this action.



201 East Washington Street, Suite 1200
Phoenix, AZ  85004

WOMBLE BOND DICKINSON

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

133. Upon information and belief, at least one flight-training provider—Leopard Flight School—is already planning to relocate training operations away from FFZ as a result of the Resolution.

134. Plaintiffs CAE and Thrust have determined that flight training at the Airport is unsustainable due to the imposition of these wrongful landing fees.

135. CAE has already received one student-pilot's departure because of the financial impact and uncertainty that CAE faces at FFZ because of the looming landing fees. Plaintiffs CAE and Thrust will suffer irreparable reputational harm and loss of goodwill because of the City's imposition of landing fees.

136. In the aviation-training industry, reputation depends on institutional reliability, regulatory credibility, and operational continuity. Plaintiffs are known for their quality work and training the next generation of pilots to operate the skies safely and confidently. Once that confidence and credible reputations are undermined by the threat of forced relocation, fee instability, and disrupted training pipelines serving interstate and international students, it cannot be restored through monetary damages.

## CAUSES OF ACTION

### COUNT ONE

### Declaratory Relief - Preemption by Federal Law

137. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

138. Under the Supremacy Clause, state and local measures are preempted where they conflict with federal law or intrude into a field Congress has reserved for exclusive federal regulation. U.S. Const. art. VI, cl. 2.

139. Federal aviation law occupies the field of air navigation, aircraft operations, and access to the national airspace system. *City of Burbank v. Lockheed Air Terminal*, Inc., 411 U.S. 624, 633–39 (1973).

140. Preemption turns on the practical purpose and effect of local action, not its label. *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 985–87 (9th Cir. 1991). Local measures are preempted where their "purpose or effect" is to control aircraft

- 20 -

operations, flight frequency, or access. *Id.*

141.   Congress has conditioned receipt of federal airport funds on written assurances that airports be available for public use on reasonable terms without unjust discrimination. 49 U.S.C. § 47107(a)(1)–(2).

142.   To ensure access to public airports without improper state and local restrictions, Congress enacted the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. § 47521, *et seq.*

143.   Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]" 49 U.S.C. § 47521(2). Because Congress recognized that local airport sponsors may seek to control access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level." *Id.* at § 47521 (3)-(4). Accordingly, ANCA expressly preempts any local efforts to regulate aircraft noise and restrict access to public airports.

144.   Congress and the FAA have established specific, exclusive mechanisms for addressing noise and operational concerns through Part 150 noise compatibility planning and Part 161 access-restriction procedures. 14 C.F.R. pts. 150, 161; *see also* 49 U.S.C. § 47521, *et seq*.

145.   FAA Order 5190.6C instructs that airports may not employ fees or economic mechanisms as an indirect means of restricting lawful aeronautical activity or access.

146.   The Resolution functions as an operational control measure which is preempted by federal law.

147.   The Resolution's structure targets operational frequency, not cost: it imposes per-landing fees on fixed-wing aircraft precisely where repetitive, safety-driven training operations involve high numbers of landings, while exempting comparable repetitive rotorcraft training.

148.   The Resolution expressly anticipates behavioral effects and builds them into the fee design by authorizing increases if operations decline. The effect is to discourage

- 21 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

lawful flight-training activity—discouraging training maneuvers such as touch-and-go landings and pattern work that are integral to pilot certification and aviation safety.

149. A local measure that predictably displaces lawful aeronautical activity through economic coercion functions as a de facto operational restriction and is preempted.

150. The City has not invoked, complied with, or obtained approval under ANCA or the FAA's exclusive mechanisms for addressing noise or operational compatibility concerns.

151. According to the City's budget, the City intends to go through the Part 161 process to address noise issues within the next five years.

152. Despite knowing it has to comply with the FAA's mechanisms to initiate a noise control measure, the City has attempted to circumvent that process, likely due to the costs of the noise studies and other requirements needed to comply with the Part 161.

153. Because the Resolution functions as an economic mechanism designed to reduce the frequency of flight-training operations in response to residential noise complaints—without the City having invoked, complied with, or obtained approval under ANCA or Part 161—the landing fees at issue fall squarely within ANCA's preemptive scope.

154. Plaintiffs are entitled to an order declaring the Resolution preempted by federal aviation law under the Supremacy Clause. *See Valenzuela v. Ducey*, 329 F. Supp. 3d 982, 998-99 n.5 (D. Ariz. 2018) (analyzing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) and *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050 (9th Cir. 2008) and explaining that the Court "is bound by Ninth Circuit law" and "[t]he Ninth Circuit has held that plaintiffs can obtain injunctive relief on the basis of the Supremacy Clause.")

## COUNT TWO

### Declaratory Relief – Violation of Anti-Head Tax Act, 49 U.S.C. § 40116(e)(2))

155. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

156. The AHTA prohibits states and political subdivisions from levying or

- 22 -

collecting charges on air commerce, except that airport proprietors may impose "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities." 49 U.S.C. § 40116(e)(2). To fall within this exception, a landing fee must: (a) be a fair approximation of the use of airport facilities; (b) not be excessive in relation to the benefits conferred; and (c) not discriminate against interstate commerce. *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369–70 (1994).

157.    Fees imposed for purposes other than legitimate cost recovery fall outside the AHTA's narrow allowance. *Tinicum Twp. v. U.S. Dep't of Transp.*, 582 F.3d 482, 487–89 (3d Cir. 2009).

158.    The Resolution's per-landing fee structure is not a fair approximation of Plaintiffs' use of airport facilities.

159.    Defendant did not provide adequate data to support that the landing fees charged are a fair approximation of use of the Airport.

160.    For flight-training schools, takeoffs and landings are not incidental—they are the core of FAA-required curriculum, recurrent proficiency training, and safety-critical pattern work.

161.    A fee that treats each touch-and-go as a separate chargeable event transforms routine training into a compounding charge untethered from any individualized impact on airfield infrastructure.

162.    The Resolution's session-based exemption for rotorcraft training demonstrates that the City recognizes counting each landing in high-frequency training contexts does not fairly track "use" for compensatory purposes.

163.    The landing fees are unjustly discriminatory against Plaintiffs, as well as flight schools and other based fixed-wing aircraft conducting training exercises.

164.    The Resolution's revenue-stabilization feature—authorizing fee increases if operations decline—confirms the charge is designed to stabilize revenue, not recover costs.

165.    A fee that increases as use decreases cannot logically represent compensation for use and is inconsistent with the AHTA's narrow permission for compensatory user

- 23 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

charges.

166. Courts have recognized equitable authority to restrain unlawful fee regimes under the AHTA. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–28 (2015); *Air Transp. Ass'n of Am. v. City of Los Angeles*, 844 F. Supp. 550, 559–63 (C.D. Cal. 1994).

167. Plaintiffs are entitled to an order declaring that the Resolution per-landing fee structure falls outside the reasonable-charge exception of 49 U.S.C. § 40116(e)(2) and violates the Anti-Head Tax Act.

168. Plaintiffs are entitled to prospective declaratory and injunctive relief under the statute.

## COUNT THREE

### Declaratory Relief – Violation of the Dormant Commerce Clause

169. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

170. The Dormant Commerce Clause prohibits state and local governments from enacting measures that unduly burden interstate commerce. U.S. CONST. ART. I, § 8, cl. 3.

171. Under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), a facially neutral regulation violates the Dormant Commerce Clause where "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." This balancing test applies even to laws benefiting public entities. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007).

172. Aviation is quintessentially interstate. Flight-training programs at FFZ serve students from across state lines, supply pilots to interstate and international air carriers, and operate under uniform federal certification standards within an integrated national aviation system.

173. CAE trains pilots for multiple interstate carriers and operators, including American Airlines, JetBlue, Southwest Airlines, Japan Airlines, and the United States Air Force.

174. Both Plaintiffs' training operations depend on high-frequency aircraft

- 24 -

landings, standardized curricula, federally issued certifications, and mobile aircraft and instructors.

175. The Resolution's per-landing fee structure imposes a disproportionate burden on interstate flight-training activity. It singles out fixed-wing aircraft performing training-related landings for per-landing fees.

176. Fixed-wing flight-training operations—those most likely to serve out-of-state students and support critical national pilot supply chains—bear exponentially higher costs than other aeronautical users making comparable use of airport facilities.

177. The Resolution further plans for reductions in training activity; it authorizes fee increases if operations decline, confirming that the fee is designed to change operational behavior.

178. The landing fees will have an extreme and negative effect on interstate commerce, for example by interrupting critical, interstate pilot supply chains, out-of-state and international student pilot training, and interstate operations by flight schools.

179. The Resolution imposes an impermissible burden on interstate commerce because it attaches escalating per-landing costs to federally required training maneuvers, thereby coercing flight-training providers that serve out-of-state students and supply pilots to the military and interstate air carriers—including American Airlines, JetBlue, and Southwest Airlines, Japan Airlines, and the United States Air Force—to raise prices, curtail operations, or relocate training activity to airports in other states where training landings are not penalized on a per-operation basis.

180. The Resolution's economic pressure predictably shifts where interstate flight-training commerce occurs by forcing the displacement of students, instructors, aircraft, and associated spending across state lines, restructuring an integrated national aviation-training market to satisfy a local policy preference without any demonstrated local benefit proportionate to the burden imposed.

181. The landing fees burden interstate commerce. The City has not demonstrated a legitimate local justification sufficient to outweigh this burden.

- 25 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

182. The City's analysis of the fees imposed only pertain to total operational costs, rather than costs tied to the based aircraft, landings in particular, or another metric.

183. The Resolution contains no cost-based analysis tying per-landing charges to incremental runway maintenance or operational expenses and offers no showing that any asserted benefit could not be achieved through less burdensome means.

184. Plaintiffs CAE and Thrust are entitled to an order declaring the Resolution unconstitutional under the Dormant Commerce Clause of the United States Constitution.

## COUNT FOUR

### Declaratory Relief – Violation of the Mesa City Charter Section 210

### and the Mesa City Code Section 9-9-13

185. Plaintiff incorporates the foregoing paragraphs as if fully stated herein.

186. If the City of Mesa wants to amend its own City code, or adopt a new code, like implementing new landing fees, it must pass an ordinance. *See* Mesa City Charter, Section 210.

187. Under Title 9, Chapter 9 in the Mesa City Code, there are specific laws dedicated to Falcon Field Airport and its operation.

188. Section 9-9-13 explains:

> As the operator and proprietor of the airport, on behalf of the citizens of the City, it is the policy and intent of the City Council: 1. To operate the airport in a businesslike manner with as little cost as possible to the taxpayer through the imposition of fair and reasonable rentals, fees, and charges [and]. . . to promote the utility, educational, and recreational aspects of general aviation.

*See* Mesa City Code, Section 9-9-13 (emphasis added).

189. Resolution No. 12480 violates Section 9-9-13 because it violates the City's own metric for reasonableness and businesslike operation that promotes educational aspects of general aviation.

190. The Resolution's per-landing fee structure is not fair and reasonable within the meaning of the Code.

- 26 -

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

191. The per-landing fee structure does not constitute a fair approximation of use of airport facilities and therefore does not reflect a businesslike allocation of airport costs.

192. Defendant did not provide adequate data to support that the landing fees charged are reasonable or a fair approximation of use of the Airport.

193. For flight-training schools, takeoffs and landings are not incidental—they are the core of FAA-required curriculum, recurrent proficiency training, and safety-critical pattern work.

194. A fee that treats each touch-and-go as a separate chargeable event transforms routine training into a compounding charge untethered from any individualized impact on airfield infrastructure.

195. The Resolution's session-based exemption for rotorcraft training demonstrates that the City recognizes counting each landing in high-frequency training contexts does not fairly track "use" for compensatory purposes.

196. The landing fees are unjustly discriminatory against Plaintiffs, as well as flight schools and other based fixed-wing aircraft conducting training exercises.

197. The landing fees operate in a manner that disfavors flight-training operations and undermine the City's codified policy of promoting general aviation and its educational functions.

198. The Resolution's revenue-stabilization feature—authorizing fee increases if operations decline—confirms the charge is designed to stabilize revenue, rather than to reflect fair and reasonable charges tied to airport use.

199. To implement the unreasonable landing fees detailed in the Resolution— whether by adoption or amendment—Defendant was required to pass an ordinance.

200. Specifically, Section 210 details "Action Requiring an Ordinance" and states:

> In addition to other acts required by law or by specific provision of this Charter to be done by ordinance, those acts of the City Council **shall be by ordinance** which:
> (A) **Adopt or amend a City Code** or establish, alter, or abolish any City department, office, or agency.
> (B) Impose or provide for imposing a fine or other penalties.

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

> (C) Regulate rates and fees charged by public utilities and fix rates and fees for City-owned utilities.
> (D) ***Amend or repeal any ordinance previously adopted***.

Mesa City Charter, Section 210 (emphasis added).

201.    The City has not passed an ordinance in relation to the landing fees, but instead adopted a resolution—Resolution 12480.

202.    The City of Mesa, by its own terms, requires an ordinance when it seeks to adopt of amend a City Code—or amend or repeal an existing code. *See* Mesa City Charter, Section 210.

203.    A resolution is not a legislative act with the force of law where an ordinance is required. *See Alpha, LLC v. Dartt*, 232 Ariz. 303, 306 (App. 2013) (finding that "The Resolution was not a legislative act with the force of law" and "[t]here is a definite distinction between an ordinance and a resolution of a governing body of a municipality.") (cleaned up).

204.    Plaintiffs are entitled to an order declaring that the Resolution is not a legislative act with the force of law because it is not an ordinance. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

<strong>COUNT FIVE</strong>

**Declaratory Relief -Violation of Arizona Open Meeting Law, A.R.S. §§ 38-431 *et seq.***

205.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

206.    Arizona's Open Meeting Law requires that all meetings of city councils be conducted openly and that agendas "list the specific matters to be discussed, considered or decided" at least twenty-four hours in advance. A.R.S. § 38-431.02.

207.    The statute requires that agendas contain "such information as is reasonably necessary to inform the public of the matters to be discussed or decided," and the law is to be construed in favor of openness. A.R.S. § 38-431.09.

208.    Public bodies may only discuss and take legal action on matters listed on the agenda or matters reasonably related thereto. *Id.*

209.    Business transacted in violation of the Open Meeting Law is "null and void."

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

A.R.S. § 38-431.05.

210. The March 23, 2026 City Council agenda listed the Resolution as a consent-agenda item described only as: "Modifying fees and charges for Falcon Field Airport. (Citywide)."

211. This description did not expressly reference "landing fees" or indicate that an entirely new category of per-landing charges—applicable to multiple aircraft classes, with detailed exemptions, delegated adjustment authority, and estimated annual fiscal impact of $2,894,770—would be adopted.

212. The adoption of a novel, economically significant landing-fee regime under a generic agenda label that could equally describe minor administrative fee adjustments did not provide the public with information "reasonably necessary to inform the public of the matters to be discussed or decided." A.R.S. § 38-431.09.

213. Moreover, the agenda hyperlink directed the reader to the City's Legistar system, which in turn contained separate links to the City Council's Report, the Resolution, and a presentation. Only within those multi-layered attachments was the landing-fee proposal identified.

214. Requiring members of the public to navigate through multiple layers of links and parse technical documents to discover that a new per-landing fee regime was at issue undermines the Open Meeting Law's requirement that the agenda itself contain information reasonably necessary to inform the public.

215. The deficiency here is substantive—a failure to inform the general public of the specific action to be taken—not merely a technical deviation.

216. Indeed, the purpose was to impose a new landing fee as opposed to modifying existing fees.

217. The City's limited pre-meeting outreach to aeronautical users and airport tenants does not satisfy the Open Meeting Law's requirement that the agenda provide adequate public notice, because the statute protects the right of all members of the public to be informed, not only identified stakeholders. A.R.S. § 38-431.01.

- 29 -

218.   Plaintiffs CAE and Thrust are therefore entitled to declaratory and injunctive relief that the Resolution is null and void because it violates Arizona Open Meeting law.

## COUNT SIX

### Declaratory Relief – Violation of the Arizona Constitution Article IX Section 25

219.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

220.   On March 23, 2026, the City Council approved a new "fees and charges for services provided by Falcon Field Airport" through the Resolution, including landing fees on flight schools like Plaintiffs CAE and Thrust.

221.   Arizona voters approved Proposition 126 in November 2018, amending the Arizona Constitution to provide the following:

> The state, any county, city, town, municipal corporation, or other political subdivision of the state, or any district created by
>
> law with authority to impose any tax, fee, stamp requirement, or other assessment, ***shall not impose or increase*** any sales tax, transaction privilege tax, luxury tax, excise tax, use tax, or any other transaction-based tax, ***fee,*** stamp requirement or assessment on the privilege to engage in, or the gross receipts o sales or gross income derived from, ***any service performed in this state***. This section does not repeal or nullify any tax, fee, stamp requirement, or other assessment in effect on December 31, 2017.

Ariz. Const. art. IX § 25 (emphasis added).

222.   The term "service" includes a broad range of covered enterprises, including taxing activities that do not produce "goods." It includes, but is not limited to, useful labor that does not produce a tangible commodity.

223.   The Resolution itself states that the "fees and charges" the City seeks to implement at Falcon Field are for "services provided by Falcon Field Airport. . . ." *See* Resolution No. 12480. The Resolution's imposition of new fees for services provided by Falcon Field Airport is an increase in fees on services within the meaning of Article IX § 25 of the Arizona Constitution.

224.   As flight schools that operate and train at Falcon Field Airport, Plaintiffs'

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

student-pilots will partake in many landings and will continue to do so, and Plaintiffs are therefore subject to the wrongful implementation of the new landing fees for services at Falcon Field Airport.

225. The Resolution violates Article IX § 25 of the Arizona Constitution.

226. Plaintiffs CAE and Thrust are entitled to an order declaring the Resolution unconstitutional under Article IX § 25 of the Arizona Constitution.

**COUNT SEVEN**

**Injunctive Relief**

227. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

228. Because the Resolution violates the United States Constitution, the Arizona Constitution, state law, and the Mesa City Charter and Code, CAE and Thrust respectfully request preliminary and permanent injunctive relief enjoining Defendant from implementing and enforcing the Resolution.

229. CAE and Thrust will suffer irreparable harm from enforcement of the Resolution, including, but not limited to, the disruption of training pipelines serving out-of-state students and interstate air carriers, the loss of intangible goodwill, the termination of student enrollments, and reputational harm.

230. CAE and Thrust will suffer immediate and irreparable injury if Defendant is not enjoined from enforcing the Resolution because they will be forced to either relocate, cease operations, or absorb unlawful costs.

231. Once those steps occur, they cannot be undone even if Plaintiffs CAE and Thrust ultimately prevail on the merits.

232. Monetary damages at law are inadequate to remedy the business and reputational harms caused by the Resolution because the injuries CAE and Thrust face—including the dissolution of interstate and international training pipelines, the permanent loss of student enrollments and downstream airline partnerships, the destruction of intangible goodwill and credible reputation built over decades, and the forced relocation of aircraft, instructors, certifications, and regulatory approvals to another state—are by their

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

nature unquantifiable and cannot be undone through a later monetary award even if CAE and Thrust ultimately prevail.

233.   If CAE and Thrust are forced to either dismantle operations, terminate student enrollments, or abandon federally regulated training infrastructure at FFZ, the status quo cannot be restored, and no sum of money can reconstitute the training relationships, market position, credible reputation within the aviation community, and operational continuity that will have been irreversibly lost.

234.   The balance of hardships tips in CAE and Thrust's favor because an injunction would maintain the status quo, delaying enforcement while legality is resolved, whereas the failure to issue relief would cause permanent displacement and harm.

235.   The public interest is served by preventing enforcement of potentially unlawful governmental action and by maintaining stable, federally regulated aviation-training infrastructure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request:

A.   An order declaring Resolution No. 12480 preempted by federal law under the Supremacy Clause of the United States Constitution;

B.   An order declaring Resolution No. 12480's per-landing fee structure in violation of the Anti-Head Tax Act, 49 U.S.C. § 40116;

C.   An order declaring Resolution No. 12480 unconstitutional under the Dormant Commerce Clause of the United States Constitution;

D.   Plaintiffs are entitled to an order declaring that the Resolution is not a legislative act with the force of law because it violates of Mesa City Charter and Codes Section 210, 9-9-13, and 9-9-14;

E.   An order declaring the adoption of Resolution No. 12480 null and void for violation of Arizona's Open Meeting Law, A.R.S. §§ 38-431 *et seq.*;

F.   An order declaring Resolution No. 12480's is unconstitutional under Article IX § 25 of the Arizona Constitution;

G.    A preliminary and permanent injunction enjoining Defendant, and its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from enforcing Resolution No. 12480 against Plaintiffs;

H.    Such other and further relief as this Court deems just and proper.


DATED this 2nd day of June, 2026.

WOMBLE BOND DICKINSON (US) LLP


By: */s/ Yalda Godusi Arellano*
Todd Feltus
Yalda Godusi Arellano
Katerina Grainger

Attorneys for Plaintiffs CAE Aviation Academy Phoenix LLC and Thrust Flight, LLC

201 East Washington Street, Suite 1200
Phoenix, AZ 85004

WOMBLE BOND DICKINSON

- 33 -

## <u>VERIFICATION</u>

I have read the foregoing Verified First Amended Complaint, and I am familiar with the matters and things herein alleged. I declare under penalty of perjury that the foregoing is true and correct. As to those matters stated upon information and belief, I believe them to be true.

Signed by:

*David Morse*

6526D729E89D4DB...

CAE Aviation Academy Phoenix LLC

[David Morse, Director of Operations]


_Executed on June 2, 2026.

Docusign Envelope ID: 8D3AB5D3-DBE4-86FB-80A0-1F3016E2BBA7

## VERIFICATION

I have read the foregoing Verified First Amended Complaint, and I am familiar with the matters and things herein alleged. I declare under penalty of perjury that the foregoing is true and correct. As to those matters stated upon information and belief, I believe them to be true.

Signed by:

0695FD3F4568492

Thrust Flight, LLC

[Patrick Arnzen, CEO]

Executed on June 2, 2026